|  |  |  |
|---|---|---|
| TYLER W., by and through his parents, Daniel W. and Kelly W., and DANIEL W. and KELLY W., individually. | : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | CIVIL ACTION |
| UPPER PERKIOMEN SCHOOL DISTRICT, | : : : : | NO. 08-5247 |
| Defendant. | : | |

**MEMORANDUM**

TUCKER, J.                                                                    August_____, 2013

Plaintiffs—Kelly and Daniel W., alongside their minor son, Tyler W.—bring this action

against defendant, the Upper Perkiomen School District (the "District"), alleging that defendant

failed to provide Tyler a free appropriate public education ("FAPE") in contravention of the

Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA"), section 504 of

the Rehabilitation Act, 29 U.S.C. § 794 ("section 504"), and Title II of the Americans with

Disabilities Act, 42 U.S.C. §§ 12101 *et. seq.* ("ADA"). Plaintiffs and defendant have filed cross-

motions for judgment on the supplemented administrative record. For the reasons set forth

below, I will grant each of their motions in part and deny them in part.

**I.      Factual and Procedural Background[1]**

---

[1] This action stems from the filing of a due process complaint with the Pennsylvania Office of Dispute Resolution ("ODR") by Daniel W. and Kelly W. against the District in October 2007. As mandated by the IDEA, a due process hearing was held before a hearing officer in the spring of 2008.

The hearing officer issued his decision in June 2008 (*See* Admin. R., Ex. 6 ("HOD")). By law, when a district court reviews an agency's decision under the IDEA, "[f]actual findings from

Tyler was born on January 23, 2001. (Admin. R. Ex. 6 ("HOD") ¶ 1.)  From an early age he displayed violent tendencies and developmental delays. (*Id.* ¶¶ 2-3.)  In January 2004, he was evaluated by the Montgomery County Intermediate Unit ("MCIU") for its early intervention pre-school program. (Pl.'s Mot. J. Admin R. Ex. A ("Klein Report") at 2.)  After a re-evaluation in May 2004, it was determined that he should receive intervention services comprising of occupational therapy and an itinerant teacher on an as-needed basis. (*Id.*)  When Tyler was four years old, various psychological evaluations diagnosed him with attention deficit hyperactivity disorder, separation anxiety, bipolar disorder, conduct disorder, and stuttering. (*Id.* ¶ 7, 9-14.)  The family went to Foundations Behavioral Health Agency ("Foundations") and on May 16, 2005, Foundations developed an initial wraparound treatment plan.  Under this plan, a behavioral specialist, a mobile therapist, and a therapeutic staff support aide provided services to Tyler. (Klein Report 2.)

In light of the above issues, Tyler received an early intervention individualized education program ("IEP") on June 9, 2005. (HOD ¶ 8.)  An IEP meeting was held on July 27, 2005; it was noted that, at the time, Tyler was attending an early intervention program (the "Children's Developmental Program") and was enrolled part-time at Red Hill School. (Klein Report 3.)

On February 8, 2006, the District held a transition meeting with the parents in

---

th administrative proceedings are to be considered prima facie correct." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).  I must defer to these factual findings "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Id.*

After careful review of the evidentiary record I find no reason to depart from the hearing officer's factual findings.  Thus, this account of the facts is largely based on the HOD.  Where the HOD does not include a relevant fact, I will refer to other portions of the administrative record, evidence supplementing the record, and the parties' briefs.

anticipation of Tyler's entry into a District school program in the fall of 2006. (*Id.*) On February 10, 2006, the District issued a permission to evaluate form, and the parents consented on February 20. (*Id.*) An evaluation report ("ER") issued on June 5, 2006; incorporated input from Tyler's pre-school teacher, occupational therapist, and physical therapist, the parents, as well as observational data from Dr. Robert Broderick. (HOD ¶ 18; Klein Report 4.) In the interim, Foundations reviewed its treatment plan on May 9, 2006. The review noted that Tyler had been hospitalized at KidsPeace from May 3 to May 9, 2006. (Klein Report 3.)

The ER found Tyler eligible for special education and related services as a student with serious emotional disturbance. (Klein Report 4.) On June 8, 2006, the early intervention program held another IEP meeting. Tyler's early intervention regimen was left largely unaltered. (*Id.*) On August 14, 2006, a psychologist with Foundations evaluated Tyler. His report notes that Tyler exited the early intervention program some time in July and began attending a partial hospitalization program ("PHP") at Creative Health on July 31, 2006. (*Id.*). The report diagnosed Tyler with Asperger's syndrome. (HOD ¶ 22.)

An IEP meeting was held on August 14, 2006, to develop Tyler's kindergarten program and determine his placement. Prior to this, the District had applied to Centennial School—an approved private school ("APS")—as a possible placement for Tyler in kindergarten. (Klein Report 5.) At the meeting, an IEP was developed that provided for occupational therapy and physical therapy. (Admin. R. Ex. 18, at S-24.) The next day, the District issued a notice of recommended educational placement ("NOREP") indicating that Tyler would continue to attend the PHP on a "60 day interim" basis. (HOD ¶¶ 24-28; Admin. R. Ex. 18, at S-28) Tyler's first day of kindergarten would have been August 28, 2006. (Klein Report 5.)

In November 2006, the District initiated referrals to various private schools in order to place Tyler. On December 7, 2006, the school issued a letter to Tyler's parents recommending placement at Wordsworth Academy, another APS, and the parents approved. (HOD ¶ 39.) On February 12, 2007, in a meeting at Wordsworth, Tyler's mother expressed dissatisfaction with the program at Wordsworth and requested that Tyler be placed at Vanguard. (*Id.* ¶ 45; Klein Report 6.) On March 7, 2007, physical therapy and occupational therapy evaluations were completed, and Tyler was found eligible for both. (*Id.* ¶¶ 48-49; Klein Report 6.) Occupational therapy was set to begin at the MCIU on April 16, 2007. (*Id.* ¶ 52.)

On May 30, 2007, an IEP team meeting was held and the District issued a NOREP that provided for extended school year ("ESY") services for the summer of 2007. (*Id.* ¶ 55.) It recommended that Tyler continue with a full-time emotional support program at Wordsworth for ESY and for the 2007-2008 school year. (Klein Report 7; Admin. R. Ex. 18, at Exs. S-69, S-70; HOD at 17.)

On June 4, 2007, Wordsworth Academy informed the parents that it would no longer provide bus transportation for Tyler due to his violent behavior. In addition to spitting, hitting, shouting, kicking, and spreading feces on the bus, Tyler made statements to the effect that he would bring a gun on the bus and kill people. (HOD ¶ 57.) Based on this incident, Tyler underwent a psychiatric risk assessment at the MCIU on July 23, 2007. (Klein Report 7.) The psychiatrist diagnosed him with Asperger's Syndrome and Oppositional Defiant Disorder. (HOD ¶ 66.) In September 2007, plaintiffs moved to the Souderton School District; however, Tyler continued at Wordsworth for the fall of 2007. (*Id.* ¶ 67; Klein Report 7.) He was eventually placed at Lower Gwynedd Elementary School and, subsequently, Fort Washington Elementary

school for the 2009-2010 school year. (Klein Report 8.)

Plaintiffs filed a complaint with Pennsylvania's Office of Dispute Resolution ("ODR") on October 26, 2007, and requested a special education due process hearing on January 8, 2008. (Pls.' Br. Supp. Mot. J. Admin. R. ("Pls.' Br.") at 1; Admin. R. Ex. 17, P-4.) The complaint alleges that the District denied a FAPE to Tyler in contravention of the IDEA and Section 504, the attendant regulations, and provisions of the Pennsylvania Public School Code. Specifically, the plaintiffs alleged that the evaluation report that served as the basis of Tyler's kindergarten IEP was inadequate. (Admin. R. Ex. 17, P-4 at 1.) Second, his IEP was substantively defective in that it failed to provide appropriate research-based instruction in reading, writing, and math. (*Id.* at 2.) Furthermore, Tyler did not receive "related services" as outlined in his IEP for most of the 2006-2007 school year. (*Id.*) Plaintiffs alleged Tyler's transportation to Wordsworth was inappropriate in that he was on the bus for approximately three hours a day. (*Id.*) Finally, plaintiffs contended that the placement at Wordsworth was not appropriate because it was not the "least restrictive environment" ("LRE") for Tyler's education, as required by the IDEA. (*Id.*)

The hearing was held on eight separate dates spanning February to May 2008, and the hearing officer, Dr. David Bateman, rendered his written decision on June 27, 2008. As Dr. Bateman notes, the district conceded that it owed Tyler compensatory education for occupational and physical therapy that it failed to provide in accordance with his IEP for a portion of the 2006-2007 school year. Tyler did not receive occupational therapy for a period of seventeen weeks spanning from December 2006 to April 16, 2007, which amounted to 8.5 hours of instruction. He did not receive physical therapy from December 2006 to June 2007; he was entitled to thirty minutes a month, which amounted to 3.5 hours of compensatory education. Thus, the District

conceded that it owed twelve hours of compensatory education. (HOD at 18.)

However, Dr. Bateman also found that the District was remiss in failing to ensure Tyler received occupational and physical therapy while he attended the PHP at Creative Health. Thus, he granted eight weeks' worth of occupational therapy and two months' worth of physical therapy (at the above rates) for an additional award of five hours compensatory education. (*Id.* at 18-19.)

Dr. Bateman rejected the rest of plaintiffs' claims for compensatory education. He found that Tyler made notable progress at Wordsworth, and that the APS placement complied with LRE requirements because Tyler exhibited significant behavioral problems. (*Id.* at 13-18.) He rejected plaintiffs' claim based on excessive transportation time. He noted that there was no firm limitation on transportation times, and there was no evidence that the lengthy bus ride denied Tyler a FAPE. (*Id.* at 19.) He concluded that "[t]hroughout the testimony and evidence presented, the Parents were not able to demonstrate that Tyler did not receive a free appropriate education." (*Id.* at 18.)

Plaintiffs appealed Dr. Bateman's decision to the Pennsylvania Special Education Appeals Panel. On August 7, 2008, the appeals panel largely affirmed the hearing officer's decision, but increased the grant of compensatory education by 7.5 hours, for a total of 24.5 hours. The appeals panel gave this additional award based on the District's failure to provide speech therapy and occupational therapy in accordance with the IEP of May 30, 2007, during the ESY program in summer of 2007. (Def.'s Mot. J. Admin. R. Ex. B. ("App.") at 5.)

The appeals panel rejected the argument that the District had conducted a deficient evaluation. It found that plaintiffs sought to impose requirements on the initial evaluation of

Tyler that were not required under the applicable regulations, and that the evaluation was appropriate in light of the fact that Tyler was nearly "untestable." (App. at 3-4, n.17.)  It rejected the LRE argument, reasoning that the negative impact that Tyler's behavior had on other children necessitated his placement in Wordsworth. (*Id.* at 4.)  Finally, it rejected the claim of excessive transportation time because plaintiffs failed to demonstrate that the duration of the bus ride adversely affected Tyler's education or denied him a FAPE. (*Id.*)

On November 4, 2008, plaintiffs filed a complaint in this court seeking independent review of the decisions of the hearing officer and the appeals panel pursuant to the IDEA.  I allowed both parties to supplement the administrative record with one additional expert report each. In early 2011, both parties moved for judgment on the supplemented administrative record, and on December 21, 2011, I heard oral argument on this matter.  On April 8, 2013, I ordered additional briefing on issues that I felt were still unclear.  The parties have addressed my questions with supplemental briefs, and now their motions are ripe for disposition.

## II.    Discussion

### A.    Legal Standard

A district court reviewing the administrative decisions of a state agency in the IDEA context conducts a modified de novo review. *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).  Under the IDEA, district courts (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).  But under the mandate of modified de novo review, a district court must accord due weight to administrative factual findings, *S.H.*, 336

F.3d at 269, which means the district court should "defer to the hearing officer's factual findings" unless it can point to contrary non-testimonial extrinsic evidence in the record. *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 529 (3d Cir. 1995). A district court exercises plenary review over legal conclusions generated in the administrative proceedings. *See Munir v. Pottsville Area Sch. Dist.*, No. 3:10-cv-0855, 2012 WL 2194543, at *3 (M.D. Pa. June 14, 2012) (citing *Warren G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 83 (3d Cir.1999)).

Where the state has set up a two-tiered administrative review process (as Pennsylvania had at the time at issue in this case), a reviewing court must also consider whether the appeals panel afforded proper deference to the hearing officer. "[A]ppeals panels reviewing the fact findings of hearing officers in two-tier schemes (such as Pennsylvania's) exercise plenary review, except that they should defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *Carlisle Area Sch.*, 62 F.3d at 528. Thus, the district should "defer to the appeals panel rather than the hearing officer in most circumstances." *Id*. at 529. "[A] district court should still give 'due weight' to the appeals panel's decision when it reverses the hearing officer's conclusions of law, inferences from proven facts, and factual findings based on credibility judgments where non-testimonial, extrinsic evidence justified the appeals panel's contrary decision." *Id.* However, the Third Circuit "assume[d] without deciding that, under IDEA, a district court should accord somewhat less consideration to an appeals panel ruling that disregards a hearing officer's credibility judgments where this standard is not met." *Id.* at 530 n.4.

When the district court affords "due weight" under modified de novo review, factual

findings made in the administrative process are to be considered prima facie correct. Should a court choose not to accept these factual findings, it is obliged to explain why. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). District courts are cautioned  not "to substitute their own notions of sound educational policy for those of the local school authorities which they review." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 205-206 (1982)). Of course, the amount and type of new evidence that a court accepts will impact the amount of deference it gives to the administrative findings, since the agencies did not have a chance to consider such evidence. *See Alex R., ex rel. Beth R. v. Forrestville Valley Comm. Unit Sch. Dist. No. 221*, 375 F.3d 603, 612 (7th Cir. 2004); *see also Carlisle Area Sch.*, 62 F.3d at 527 ("[D]istrict courts have discretion to determine how much deference to accord the administrative proceedings."). Ultimately, "a court must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative and useful in determining whether Congress' goal [in enacting the IDEA] has been reached for the child involved." *Susan N.*, 70 F.3d at 760.

" [T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012). "[P]recedent makes it clear that '[t]he issue of whether an IEP is appropriate is a question of fact'," *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009) (quoting *Carlisle Area Sch.*, 62 F.3d at 526)).  Thus, I must afford such a finding "due weight" under the review scheme outlined above. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) ("But whether [Plaintiffs] proved an exception to the [2004 IDEA] statute of limitations, and whether the [School] District fulfilled its FAPE obligations . . . are

subject to clear error review as questions of fact. Such [f]actual findings from the administrative proceedings are to be considered prima facie correct, and if [we] do[ ] not adhere to those findings, we must explain why." (alterations in original) (internal quotation marks and citations omitted)).

B.      **Application**[2]

Plaintiffs advance many of the same arguments they pressed at the administrative level, but claim they are entitled to more compensatory education than was granted by ODR. First, they argue that the evaluation procedure followed by the district and the resultant IEP—both during the academic year and ESY in summer of 2007—were grossly inadequate. (Pls.' Br. at 6-14, 18-19.)  Second, they argue that the district's decision to place Tyler in Wordsworth violated the IDEA because this placement was unduly restrictive. (*Id.* at 14-17.)  Third, they argue that the Tyler lengthy bus ride to and from the Wordsworth constituted a denial of FAPE. (*Id.* at 17-18.)  Fourth, they argue that the District failed to provide "related services" in connection with the ESY program in the summer of 2007. (*Id.* at 18-19.)  Finally, plaintiffs raise the related claim that they are entitled to *full* days of compensatory education for the time Tyler spent in the PHP at Creative Health from August to December 2006. The hearing officer only granted them

--------

[2] Plaintiffs bring the exact same FAPE claims under both the IDEA and section 504; my treatment of the claims under the IDEA is dispositive of the section 504 claims. (Pls.' Br. at 19.) *See D.K. v. Abington Sch. Dist.*, 696 F.3d at 249, 253 n.8; *Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation*, 490 F.3d 337, 349 (3d Cir. 2007). For purposes of brevity, I refer only to the IDEA, but my analysis applies to both statutes.
    Plaintiffs do not object to dismissal of the ADA claim due to non-exhaustion. (Pls.' Supplemental Br. at 10.) *See* 20 U.S.C. § 1415(l) ("[B]efore the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.")

compensatory education based on the denial of certain "related services" (occupational and physical therapy). (*Id.* at 11-12.)

a. **Improper evaluation and IEPs**

The hearing officer implicitly rejected the plaintiffs' claim with respect to the evaluation that Dr. Broderick and the District conducted in developing Tyler's kindergarten IEP. He found that Dr. Broderick's evaluation "focused on the problem behaviors Tyler exhibited and made recommendations based on that focus after consulting with the teachers and reviewing his previous behavior." (HOD at 15.) He concluded that the restrictive placement recommended by Dr. Broderick was appropriate in light of the "severe aggressive and violent behaviors Tyler demonstrated during the preschool setting," (*Id.*)

The appeals panel elaborated on the hearing officer's denial with cogent reasoning, explaining that while the evaluation may have omitted some of Tyler's (numerous) diagnoses, the evaluation "correctly identified [Tyler's] needs." (App. at 3 n. 15.) Correct identification of a student's needs, as opposed to categorization by diagnoses, is the predicate for an appropriate IEP. (*See id.*) Furthermore, plaintiffs mistakenly relied on the omission of a functional behavioral assessment as part of the evaluation: such an assessment is only required "with regard to disciplinary issues." (*Id.* at 3 n.16 (citing 34 C.F.R. § 300.350).) Finally, plaintiffs contended that Dr. Broderick could not possibly have properly administered achievement tests based on the amount of time he testified he spent trying to test Tyler. This overlooks the fact that testing was cut short due to Tyler's severe behavioral problems. (*Id.* at n.17; Admin. R. Ex. 16, N.T. at 89-91.)

Insofar as plaintiffs argued that the IEPs were faulty apart from alleged shortcomings in

11

the evaluation process, this contention was also largely rejected in the administrative proceedings. To provide a FAPE, the District must formulate an IEP that is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *Shore Regional*, 381 F.3d at 198. The hearing officer credited the testimony of Tyler's teachers at Wordsworth that he made social and academic progress and became less violent. While Tyler's mother conclusorily asserted that he regressed behaviorally during his time at Wordsworth, she did not adequately explain what constituted this regression. (HOD at 17-18.) A student's demonstrated progress goes towards showing the adequacy and appropriate implementation of an IEP and the provision of FAPE. *See, e.g.*, *D.S. v. Bayonne*, 602 F.3d 553, 567 (3d Cir. 2010) ("It certainly was reasonable for the Court to consider [student's] progress in evaluating the appropriateness of the IEP."). Giving due weight to the administrative findings that the IEPs were appropriate, I find no basis in the record or supplemental expert reports to upset the decisions of the hearing officer and appeals panel in this regard.

### b. Failure to place in LRE

Plaintiffs claim that Tyler was denied a FAPE because Wordsworth was not the LRE appropriate for his education.[3] 20 U.S.C. § 1412(a)(5)(A) provides,

---

[3] The Third Circuit has issued confusing pronouncements about the relationship between FAPE, LRE, and an award of compensatory education. *Compare S.H.*, 336 F.3d at 265 ("[T]he IDEA includes a mainstreaming component in its description of a free and appropriate education, requiring education in the least restrictive environment."); *with A.G. ex rel. S.G. v. Wissahickon Sch. Dist.*, 374 F. App'x 330, 334 (3d Cir. 2010) ("Contrary to [plaintiff's] conflation of the two concepts, FAPE and LRE are distinguishable, a proposition supported by *T.R. v. Kingwood Township Board of Education*, 205 F.3d 572, 578 (3d Cir. 2000). There, we affirmed the district court's finding that the student received a FAPE, but vacated the district court's holding that the student's placement was the LRE."). Under the *S.H.* formulation, violation of the LRE mandate necessarily entails failure to provide a FAPE, which in turn triggers compensatory education. *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 250 (3d Cir. 1999), *superseded by*

To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

The Third Circuit has outlined a two-prong test for determining whether a district has complied with this LRE or "mainstreaming" requirement of the IDEA. *See Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1209 n.6, 1215 (3d Cir. 1993). It stated:

In sum, in determining whether a child with disabilities can be educated satisfactorily in a regular class with supplemental aids and services (the first prong of the two-part mainstreaming test we adopt today), the court should consider several factors, including: (1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class.

If, after considering these factors, the court determines that the school district was justified in removing the child from the regular classroom and providing education in a segregated, special education class, the court must consider the second prong of the mainstreaming test—whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate.

*Id.* at 1217-18.[4]

_____

*statute on other grounds* ("An award of compensatory education allows a disabled student to continue beyond age twenty-one in order to make up for the earlier deprivation of a free appropriate public education."). *A.G.*, however, explicitly states that there are situations where a district can violate the LRE mandate while providing a FAPE, and that in such situations, an award of compensatory education may "improper." 374 F. App'x at 335 (citing *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272-73 (3d Cir. 2007)).

I will assume without deciding that compensatory education can be an appropriate remedy for a school district's violation of the LRE mandate. I do so because plaintiffs fail to demonstrate that the District contravened the LRE requirement.

[4] *Oberti* dealt with 20 U.S.C. § 1412(5)(B), which became § 1412(a)(5)(A) after the 1997 amendments to the IDEA. *See Warren G.*, 190 F.3d at 83. This renumbering does not affect the applicability of the standards set forth in *Oberti*. *See, e.g.*, *L.G. ex rel. E.G. v. Fair Lawn Bd. of*

After careful review of the testimony in the administrative proceedings, the decisions of both the hearing officer and the appeals panel, as well as the new supplemental expert reports, I see no reason to disturb the agency's factual findings or its ultimate rejection of plaintiffs' mainstreaming argument. The record is replete with evidence that Tyler exhibited extremely aggressive behavior that would negatively impact the ability of students around him to learn, and that justifies his placement in Wordsworth's restrictive setting. (HOD 14-16; App. at 1 n.2.) Dr. Broderick, a practicing school psychologist for thirty years, testified that Tyler was among the most violent children he had ever interacted with. In the one day that Dr. Broderick observed Tyler at the MCIU, Tyler head-butted and punched a teacher in the face and head-butted a student. According to Dr. Broderick, he exhibited no remorse for his actions and seemed to enjoy threatening and intimidating other students. (*See* Admin. R. Ex. 16, N.T. at 48, 73, 127-28, 135-136, 158.) According to the teachers who worked with Tyler at the MCIU, this was not atypical behavior. (*Id.* N.T. at 193.) Based on his observation, Dr. Broderick believed that it would be impossible to integrate Tyler into the less restrictive setting of a regular education classroom. (*Id.* N.T. at 172-73, 195.) Testimony from teachers at Wordsworth as to Tyler's behavior when he first came to the program confirm that he was extremely aggressive, disrespectful, and difficult to manage. (Admin. R. Ex. 9, N.T. at 1244, 1324.)

The special education directors who worked with Tyler and his family testified that a spectrum of placements were considered, some more integrated than others, but that they were ruled out as Tyler's behavioral issues became more apparent during his time at Creative Health. (Admin. R. Ex. 15, N.T. at 258-262, 317-319; Ex. 16, N.T. at 369-370, 375-376, and 389.) Even

*Educ.*, 486 F. App'x 967, 973 (3d Cir. 2012) (continuing to apply *Oberti*).

plaintiffs' supplemental expert report reveals that Tyler was enrolled in a full-time emotional support program beginning January 2009, and as of June 2009, it appears that he had minimal integration with non-disabled peers. (Klein Report 8-9.)

Giving due weight to the administrative findings, and mindful that plaintiffs have the burden of proving noncompliance with the LRE mandate, I believe this evidence shows that the District discharged its obligation to educate Tyler in the LRE as set forth in *Oberti*. The first prong is satisfied because Tyler's behavior would clearly detract from his own education and the education of others in a regular education setting. And in light of his extreme emotional problems, the District could reasonably believe that *no* "inclu[sion of] the child in school programs with nondisabled children" would be appropriate, thus satisfying the second prong of *Oberti*. While plaintiffs criticize the District's placement, they nowhere explain in concrete terms how Tyler could have been further mainstreamed. Therefore, I will not upset the conclusion of the hearing officer and appeals panel that the District abided by the IDEA's LRE requirement.

### c. Excessively long bus ride

Plaintiffs claim that Tyler was denied a FAPE based on the excessive time it took to transport Tyler to Wordsworth. This claim was rejected by the hearing officer and appeals panel. The appeals panel noted that the applicable law and regulations do not set a firm cap on transportation times, and it found that plaintiffs did not adduce any evidence at the due process hearing to show how the long bus ride deprived Tyler of a FAPE. (App. at 4.) The supplemental expert report does not touch on this aspect of plaintiffs' claims. Upon review of the record, I also find there is no evidence linking the bus ride to a denial of FAPE. I will uphold the finding of

the appeals panel that Tyler was not denied a FAPE based on the duration of his bus ride.

###### d. Failure to offer appropriate ESY services during the summer of 2007

Plaintiffs assert that the District did not offer an "appropriate" ESY program to Tyler. (Pls. Br. at 18.)  I construe this argument as comprising two subclaims. First, plaintiffs seek to challenge procedural inadequacies in the development of the May 30, 2007 IEP and its content. This subclaim is a repetition of their challenge to the IEPs (addressed above). I reject it for the same reasons.

Second, plaintiffs argue that the District "disregard[ed] ESY mandates," by failing to provide occupational therapy, physical therapy, and speech/language therapy. (*Id.* at 19.)  The appeals panel granted 7.5 hours of compensatory education to plaintiffs to remedy the lack of speech and occupational therapy services. (App. at 5.)  It did not provide any compensatory education related to physical therapy because that was not provided for in the May 30, 2007 IEP. (*Id.* at 5 n.23; *see* S-70.)  Given that I have found Tyler's IEPs to be appropriate, I see no reason to depart from the appeal panel's grant of compensatory education in accordance with those IEPs. Therefore, I will affirm the decision of the appeals panel in its grant of 7.5 hours of compensatory education related to the denial of services in the summer of 2007.

###### e. Inadequate compensatory education for failure to provide a FAPE while Tyler attended PHP

Plaintiffs claim that Tyler is entitled to full days of compensatory education for the period he was at Creative Health.  While the plaintiffs include this argument as part of their claim that Tyler's IEP was inappropriate, (*see* Pls.' Br. at 11-12), I have separated it out because it more accurately concerns the implementation of Tyler's IEP as opposed to its contents. *See Derrick F.*

*v. Red Lion Area Sch. Dist.*, 585 F. Supp. 2d 282, 295 (M.D. Pa. 2008) (noting difference between contents-based challenge and implementation challenge for purposes of IDEA exhaustion analysis). The hearing officer found that Tyler received a FAPE based on an appropriately-designed IEP while at Wordsworth. However, he also found that the District failed to provide related services in accordance with the IEP while Tyler was at Creative Health. The appeals panel affirmed the grant of compensatory education for the lack of occupational and physical therapy while Tyler was in the PHP. (App. at 5.)

This award is, of course, predicated on the conclusion that the District was responsible for Tyler's education while he was in Creative Health. Per the August 15, 2006 NOREP, Creative Health was the recommended placement for Tyler beginning August 28, 2006 (the first day of kindergarten in the 2006-2007 academic year). (Admin. R. Ex. 18, S-28.) It is well established that the District, as the local educational agency ("LEA") responsible for Tyler, could not divest itself of its obligations under the IDEA by placing Tyler in a PHP. *See, e.g.*, 34 C.F.R. § 300.2(c) (LEAs must ensure that student receive FAPE when LEA places him in a private facility); *Koehler ex rel. Koehler v. Juanita Cnty. Sch. Dist.*, No. 1:07-cv-0017, 2008 WL 1787632, at *7 (M.D. Pa. Apr. 17, 2008) ("[E]ven when a private entity is the means of effectuating the mandate of the IDEA, public agencies retain responsibility for ensuring that IDEA standards are upheld."); *P.N. v. Greco*, 282 F. Supp. 2d 221, 237 (D.N.J. 2003) ("[P]ublic educational authorities cannot divest themselves of their responsibilities under the IDEA by placing children with disabilities in private schools."). As part of the administrative record before the appeals panel, plaintiffs submitted a December 19, 2007 letter from the Pennsylvania Department of Education that emphasizes that "it is the responsibility of the student's resident school district to provide or

ensure the provision of education services to a child who is placed in a PHP." (Admin. R. Ex. 8, Ex. A at 1.) Therefore, I conclude, as a legal matter, that the District's obligation to provide Tyler a FAPE was not altered by the fact that he was in a PHP.[5]

Yet neither the hearing officer nor the appeals panel clearly engaged with plaintiffs' argument that they are entitled to *full* days of compensatory education for the time Tyler spent in Creative Health. Indeed, it appears that he was denied more than just related services. The record discloses that Tyler only received *one hour* of academic instruction per day while at Creative Health. (NT 969.) Even this hour was not in compliance with the specially designed instruction set out in Tyler's IEP. (N.T. 979-980.) The hearing officer writes, with support from the record, that "the District knew little about the program for Tyler at Creative Health" and that "he made little academic progress." (HOD at 17.) The director of the program at Creative Health even testified that Tyler's IEP was not being implemented. (N.T. 976.)

In light of the record as a whole, I find by a preponderance of the evidence that there was absolutely no implementation of Tyler's IEP while he attended Creative Health. I cannot give any "due weight" to the administrative proceedings, because there was no factual finding on this particular point. If anything, the findings below—that Tyler was denied related services and made no academic progress—support my finding here.[6]

---

[5] To the extent that the appeals panel ruled otherwise, (*see* App. at 3 ("The school bears no responsibility for the parents' decision to hospitalize their child.")), I overturn its legal conclusion.

[6] In the event the hearing officer *did* find a total failure to implement the IEP, his limitation of compensatory education to related services was a legal conclusion over which I exercise plenary review. In that case, I conclude that there is no basis to curtail the grant of compensatory education and that the hearing officer and appeals panel committed legal error in doing so.

Under the IDEA, I have "considerable discretion when fashioning a remedy." *Heather D. v. Northhampton Area Sch. Dist.*, 511 F. Supp. 2d 549, 555 (E.D. Pa. 2007) (citing 20 U.S.C. § 1415(i)(2)(C)(iii)). "Compensatory education is an appropriate remedy where a school district knows, or should know, that a child's educational program is not appropriate or that she is receiving only a de minimis benefit and fails to correct the situation." *Id.* (citing *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996)). "The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem." *Id.* (citing *M.C.*, 81 F.3d at 397).

When I requested supplemental briefing, I gave the District an opportunity to explain how much compensatory education Tyler should receive in light of the total failure to implement his IEP in the PHP. It declined to answer the question. Plaintiffs argue that they should receive full days of compensatory education. They cite to cases that indicate that courts should not attempt to "to parse out the exact amount of hours [a student] was not benefitted by FAPE" and that full days of compensatory education is an appropriate remedy. *Keystone Cent. Sch. Dist. v. E.E. ex rel. H.E.*, 438, F. Supp. 2d 519, 526 (M.D. Pa. 2006). *See also Damian J. v. Sch. Dist. of Phila.*, No. 06-3866, 2008 WL 191176, at *7 n.16 (E.D. Pa. 2008) (same). Where a student makes little to no academic progress, it indicates that the District's failure to address his needs pervaded and undermined his entire school day. *See Heather D.*, 511 F. Supp. 2d at 557. Furthermore, it is clear that the District knew of Tyler's needs well in advance of the start of kindergarten, and "an appropriate program to address those needs should have been in place." *Id.* at 555. Therefore, I will not reduce the grant for the "time reasonably required for the school district to rectify the

problem," as that time had run out before August 28, 2006. *See id.* at 556-557 (granting compensatory education from the first day of the school year).

Thus, I will vacate the grant of five hours that the hearing officer gave for the denial of related services while Tyler was in the PHP, and I will replace it with a grant of full days of compensatory education for the period from August 28, 2006 to December 11, 2006. There are 15 school weeks in this period, and, per his IEP, Tyler was to receive 28 hours per week of education. (*See* Admin. R. Ex. 18, S-24 at 25.) Thus, plaintiffs are entitled to 420 hours of compensatory education. This is in addition to the compensatory education plaintiffs received for the denial of related services during the school year and ESY while place at Wordsworth (twelve hours based on the District's concession and 7.5 hours awarded by the appeals panel). The total award of compensatory education is 439.5 hours. As set forth in plaintiffs' proposed order, the parties will confer on the manner in which the compensatory education must be provided.

### f.      Attorney's fees

Plaintiffs requested attorneys' fees in their original complaint. (Compl. at 26.) However, in their motions for judgement on the administrative record, neither party has addressed the issue of attorneys' fees. Based on the significant increase in the award of compensatory education, plaintiffs may be a prevailing party entitled to reasonable attorneys' fees under the IDEA. *See* 20 U.S.C. § 1415(i)(3)(B)(i)(I). I will direct plaintiffs to file a petition for reasonable attorneys' fees.

## III.      Conclusion

For the reasons set forth above, I will affirm the decisions of the hearing officer and appeals panel to the extent that they found that plaintiffs were eligible for compensatory

education based on the denial of related services during Tyler's placement at Wordsworth. However, I will overturn their decision with respect to the amount of compensatory education Tyler should receive based on the failure to implement his IEP while he was placed in Creative Health from August 28 to December 11, 2006.   An appropriate order follows.

**BY THE COURT:**

**/s/ Petrese B. Tucker**

_____

**Hon. Petrese B. Tucker, C.J.**